[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 30, 2002
THOMAS K. KAHN
CLERK

_____

No.  00-13147

_____

D. C. Docket No.  98-00997 CV-ORL-19A


JOE JOHN RODRIGUEZ,

                                                        Plaintiff-Appellee,

        versus

WAYNE W. FARRELL,
LOIS SZCZEPANSKI,

                                                        Defendants-Appellants.



_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 30, 2002)**


Before EDMONDSON and RONEY, Circuit Judges, and JORDAN*, District
Judge.

_____

•        Honorable Adalberto J. Jordan, U.S. District Judge for the Southern District of Florida,
         sitting by designation.

EDMONDSON, Circuit Judge:

This appeal is about an arrest, the Fourth Amendment, and mistaken identity. Joe John Rodriguez sued Sergeant Wayne Farrell ("Sgt. Farrell") and Officer Lorri Szczepanski ("Officer Szczepanski"), under 42 U.S.C. § 1983, alleging that the police officers violated the Constitution when they mistakenly arrested him pursuant to a valid arrest warrant for another person. Sgt. Farrell and Officer Szczepanski, in their personal capacities, appeal the district court's denial of qualified immunity. We reverse.

FACTS[1]

On 8 September 1995 at 12:10 a.m., Officer Szczepanski pulled over a vehicle driven by Patricia Foulkes ("Ms. Foulkes"): the vehicle had a broken tag light. Rodriguez was the only passenger in Ms. Foulkes's car. Shortly after the initial traffic stop, Sgt. Farrell arrived to provide backup.

Officer Szczepanski told Ms. Foulkes to get out of the car and then asked for her driver's license. After Ms. Foulkes said that her driver's license was in her

---

[1]Because this appeal is from the denial of summary judgment, we must view the evidence in the light most favorable to the plaintiff. Hudson v. Hall, 231 F.3d 1289, 1292 n.2 (11th Cir. 2000). "But, we stress that the 'facts' set out in this opinion--the 'facts' that we must assume for the purposes of this appeal--may turn out not to be the actual facts of this case." Id.

purse which was in her car, Officer Szczepanski returned to the car and asked Rodriguez, who was seated in the car with his arm in a sling and resting on a pillow,[2] to hand her Ms. Foulkes's purse. After Rodriguez handed her Ms. Foulkes's purse, Officer Szczepanski directed Rodriguez to get out of the vehicle. Rodriguez complied and walked around freely beside the vehicle. But, before Rodriguez got out of the vehicle, he removed his sling. Because Rodriguez was wearing a long-sleeve shirt (after he had removed his sling), nothing outwardly indicated that Rodriguez's arm was injured.

Officer Szczepanski returned to Ms. Foulkes, found unlawful drugs (methamphetamine, as well as others) in her purse, and arrested her. Officer Szczepanski thereafter began to search Ms. Foulkes's car. Then, Sgt. Farrell -- who, to this point, had only been observing the situation from a position behind Ms. Foulkes's car[3] -- approached Rodriguez.

Sgt. Farrell asked Rodriguez for identification. Rodriguez directed Sgt. Farrell's attention to a duffle bag, which contained more than ten pieces of identification, including Rodriguez's Florida driver's license, birth certificate,

---

[2] Rodriguez had severely injured his arm in a motorcycle accident.

[3] Rodriguez testified at his deposition that Sgt. Farrell was behind the car and that he could see the Sergeant in one of the car mirrors. Rodriguez also testified that the interior of the car was "dark."

military discharge papers, social security card, credit card, and V.A. patient data card.[4] Sgt. Farrell, after obtaining consent from Rodriguez, searched the duffle bag and removed the driver's license from the organizer that contained Rodriguez' identifications. During the search, Sgt. Farrell noticed several prescription-drug bottles and questioned Rodriguez about their purpose. Rodriguez told the Sergeant that he had just gotten out of the hospital after a motorcycle wreck. Sgt. Farrell also briefly looked at a collection of hospital records[5] that were in the duffle bag.

Sgt. Farrell called dispatch over his radio and ran a check on Rodriguez's driver's license information. The dispatcher responded, "no wants or warrants." Sgt. Farrell continued to talk with the dispatcher when a "name hit" was obtained on Rodriguez's name. Teletype communications to the dispatcher indicated that three warrants existed for a Victor Heredia who used the alias "Joe Rodriguez."[6] Heredia was wanted by the St. Johns County, Florida Sheriff's Department for

---

[4] Rodriguez had this extraordinary collection of identifications with him to apply for benefits.

[5] Rodriguez testified at his deposition that he did not know the extent of these records. But, he believed that they were fewer than 100 pages, covered the motorcycle accident, and were for the purpose of applying for disability benefits.

[6] The warrant for Heredia was almost six years old.

several charges, including possession of cocaine.[7]  The dispatcher relayed descriptive information from the warrant to Sgt. Farrell.

The following chart lists relevant descriptive information from the warrant that was available and the corresponding information for Rodriguez:

| Name: | Victor Manuel Heredia a/k/a Joe Rodriguez | Joe John Rodriguez |
|---|---|---|
| Sex: | Male | Male |
| Race: | White | White |
| Date/Birth: | 6/24/53;<br>7/2/53;<br>6/23/53(multiple) | 3/23/53 |
| Place/Birth: | New York | New York |
| SSN: | 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;<br>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;<br>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<br>  (multiple) | 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 |
| Tattoos | 4 tattoos: right forearm, left arm, right arm, back | 6 tattoos: both biceps, both shoulder blades; both ankles (none on right forearm) |
| Height: | 5' 6" | 5'11" |
| Weight: | 139 lbs. | 180 lbs. |
| Hair Color: | Brown | Brown |
| Eye Color: | Green | Brown |
| Scar | Scar: forehead | No scar |
| Residence: | St. Augustine, Florida | Apopka, Florida |

---

[7] The other two charges were for unlawful use of a driver's license and driving with a license that was suspended or revoked.

After Sgt. Farrell received identifying information from the dispatcher, Sgt. Farrell approached Rodriguez and questioned him about two of his physical characteristics: height and tattoos. Sgt. Farrell first asked Rodriguez his height. Rodriguez responded by claiming he was 5'11". Sgt. Farrell disagreed, stating: "No way, I'm 5'11", you're shorter than me." Rodriguez claims that Sgt. Farrell was standing on a curb when Farrell made this statement. Sgt. Farrell then focused on Rodriguez' tattoos. Convinced by the fact that Rodriguez had at least four tattoos (he had six) and that the locations of the first two identified by Rodriguez were in the locations listed in the warrant, Sgt. Farrell arrested Rodriguez on the Heredia warrant.

When Sgt. Farrell arrested Rodriguez, Sgt. Farrell grabbed Rodriguez' left arm, twisted it behind Rodriguez' back, and forced it up to just below the shoulder-blade. Rodriguez fell to the ground screaming in pain, telling Sgt. Farrell that he was hurting his arm.[8] Sgt. Farrell ignored Rodriguez' screams, completed the cuffing, and took Rodriguez to the station. After arriving at the station roughly 10 minutes later, Rodriguez was placed in a holding cell and his cuffs were removed.

---

[8] Rodriguez testified at his deposition that he, before the arrest began, did not tell Sgt. Farrell that his arm was injured.

## DISCUSSION

"Qualified immunity protects government officials performing discretionary functions ... from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Lassiter v. Alabama A&M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc).

"Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Id. Whether a defendant official has violated a constitutional right at all is, of course, "a 'necessary concomitant' to the question of qualified immunity: if a defendant has not violated the law at all, he certainly has not violated clearly established law." Hudson v. Hall, 231 F.3d 1289, 1294 (11th Cir. 2000) (quoting GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1366-67 (11th Cir. 1998)).

A. The Arrest

1.    Constitutional Violation

"A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996). We conclude that no violation occurred in this case. In reaching this conclusion, the Supreme Court's opinion in Hill v. California, 401 U.S. 797 (1971), and various cases from the Seventh Circuit (as well as other circuits) guide our determination.

In Hill v. California, 401 U.S. 797 (1971), the Supreme Court determined, in a criminal case, whether the mistaken arrest of one person (for whom no probable cause to arrest existed) based upon the misidentification of that person as a second person (for whom probable cause to arrest existed) violated the Constitution. The Court concluded "no," writing that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." Id. at 802 (alteration in original).

The same "reasonable mistake" standard applies (1) in the context of a section 1983 action and (2) when the police have a valid warrant -- as opposed to

8

just probable cause -- to arrest someone, but mistakenly arrest someone else due to a misidentification.  E.g., White v. Olig, 56 F.3d 817, 820 (7th Cir. 1995) (using Hill "reasonable mistake" standard in section 1983 case and determining that mistaken arrest pursuant to valid warrant was reasonable); cf. Rodriguez v. Jones, 473 F.2d 599, 605-06 (5th Cir. 1973) (concluding plaintiff could not recover, under section 1983, against officers who forcibly entered plaintiff's residence pursuant to mistaken belief that two fugitives named in arrest warrants were in residence because officers' mistaken belief was reasonable under the circumstances).  See generally U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.") (emphasis added).  We must, therefore, determine as a legal matter whether Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez -- pursuant to the execution, in the field, of a valid arrest warrant for Heredia  -- was outside the scope of "reasonable mistakes."

The Eleventh Circuit has no precedents for what constitutes an unreasonable seizure due to a mistaken identification and arrest under a valid warrant in the field. The Seventh Circuit, however,  has addressed this problem in several opinions: their

9

discussions guide us today.[9] In <u>Johnson v. Miller</u>, 680 F.2d 39, 42 (7th Cir. 1982), the court concluded, as a matter of law, that a police officer's misidentification arrest of a white woman pursuant to an arrest warrant for a black woman did not violate the Constitution. In <u>Patton v. Przybylski</u>, 822 F.2d 697, 698-99 (7th Cir. 1987), the court concluded that a police officer's misidentification arrest of the plaintiff -- a black man with the same name as a black man listed in an arrest warrant -- was, as a matter of law, a reasonable mistake that did not violate the Constitution, although plaintiff's driver's license was from a different state, listed an address different from the one in the arrest warrant, and listed plaintiff's date of birth as different from the one in the arrest warrant. In <u>Brown v. Patterson</u>, 823 F.2d 167, 169 (7th Cir. 1987), the court concluded that a police officer's misidentification arrest of the plaintiff -- a black man with the same name as the alias[10] of a black man listed in an arrest warrant -- was, as a matter of law, a reasonable mistake that did not violate the Constitution, although the plaintiff's driver's license listed an address different (in a different city) from the one in the

---

[9] The Seventh Circuit's views on the subject are consistent with other circuits. <u>See</u> <u>Brady v. Dill</u>, 187 F.3d 104, 114 (1st Cir.1999) (citing, among others, Seventh Circuit opinion concluding that mistakenly arresting person of different race not unreasonable and stating that "courts have concluded with some regularity that relatively minor discrepancies in physical features or other data do not render unreasonable an arrest pursuant to a facially valid warrant").

[10] The alias was a very common name with 15 identical listings in the local phone book.

10

arrest warrant and listed plaintiff's date of birth as different (by 12 days) from the one in the arrest warrant.

According to a district court in the Seventh Circuit, these three cases stand for this proposition: "In the Seventh Circuit's view, a police officer acts reasonably if he arrests a person after determining that the person's name matches the name listed on an outstanding arrest warrant." Bruce v. Perkins, 701 F. Supp. 163, 164 (N.D. Ill. 1988). We, however, need not adopt this broad rule to decide today's case. To the contrary, as the Seventh Circuit itself has recognized, we must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness. See Patton, 822 F.2d at 699-700 (examining totality of the circumstances); see also United States v. Glover, 725 F.2d 120, 122 (D.C. Cir. 1984) ("The reasonableness of the arresting officers' conduct must be determined by considering the totality of the circumstances surrounding the arrest."); cf. United States v. Gonzalez, 969 F.2d 999, 1006 (11th Cir. 1992) (concluding that: "A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances.").

Rodriguez' identifying information was identical to the information listed in Heredia's warrant in four critical aspects: same name, same sex, same age,[11] and same race. Significant other information was similar: (1) they had similar Social Security numbers;[12] (2) they had addresses in neighboring towns;[13] and, (3) they were born in the same state. Rodriguez (4) also had no fewer tattoos than Heredia, and many of the tattoos were in the same locations. Against all of these similarities is one material[14] difference: Rodriguez says he is 5'11" tall, and the warrant listed

---

[11] According to the warrant, Heredia used multiple birth dates. Heredia's various birthdays all occurred in 1953, the same year Rodriguez was born.

[12] According to the warrant, Heredia used multiple Social Security numbers. Heredia's various Social Security numbers were all similar to each other and similar to Rodriguez'.

[13] See Brown, 823 F.2d at 169 (relying on following when determining that arrest was reasonable: "If like many criminals [the person listed in the warrant] has an alias--and there is no suggestion that he does not, in fact, use the alias of "Anthony Brown"--it would not be surprising if he also has a false address and birthdate. ... Harvey, where [the plaintiff] was arrested, surrounds Phoenix, where he lives, and is near Chicago, where [the person listed in the warrant] lives (or lived when the warrant was issued--he presumably decamped shortly afterward, or he would have been arrested).").

[14] We do not consider the other differences of much importance. Eye color (given contact lens), scars (given cosmetic surgery), and weight are all easily variable, especially over six years. This variability lessens the importance of differences in these characteristics. See Brady, 187 F.3d at 112 (discussing false arrest cases in context of false imprisonment case and stating that "we live in an age where altering physical features may be accomplished with facility"); Blackwell v. Barton, 34 F.3d 298, 304 (5th Cir. 1994) (stating, in context of mistaken arrest case, "discrepancies in hair and eye color or skin tone are not determinative in this day when use of hair dyes, cosmetic contact lenses, and tanning salons is relatively common"). Not every change in a fugitive's appearance can properly prevent arrest by police officers.

Heredia as 5'6".[15]   A reasonable mistake cannot, however, be transformed into an unreasonable mistake over such a small difference, given all the circumstances.

In other words, in the context of this case, a mistaken estimate of no more than five inches does not equal a constitutional violation.  After all, Sgt. Farrell and Officer Szczepanski were in the field, not in a police station.  Cf. Cannon v. Macon County, 1 F.3d 1558 (11th Cir. 1993) (reinstating jury verdict against official who worked at police station after concluding that official's failure, when under no time pressure over seven-day period at police station, to investigate discrepancies between descriptive information contained in arrest warrant and description of person arrested pursuant to that warrant amounted to constitutional violation), modified, 15 F.3d 1022 (11th Cir. 1994).  They -- after midnight, on a dark street,

---

[15]Arresting police officers need not act as judges determining ultimate facts.  Trials of guilt or innocence cannot be undertaken by police officers on the side of the road in the middle of the night before an officer can effect a lawful arrest pursuant to a valid warrant.  In this case, the arresting officer said, on the spot, he did not believe plaintiff was as tall as plaintiff claimed to be.  The officer was not obligated to accept plaintiff's statements as true.  See Marx v. Gumbinner, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990).  Moreover, even if the arresting officer was fully aware that plaintiff was some inches taller than the 5'6" set out in the warrant, not every discrepancy (as we have already said) in height and so forth would demand that the policeman refrain from executing the warrant.  See Thompson v. Prince William County, 753 F.2d 363, 365 (4th Cir. 1985).  Other strong indicators in the warrant matched plaintiff.  There are limits on how much independent investigating an officer must make before executing an arrest warrant, even when the arrested person is asserting a claim of mistaken identity.  See Baker v. McCollan, 99 S. Ct. 2689, 2695 (1979).  The question is not whether the police could have done more; but whether they did just enough.  Furthermore, the circumstances that justify a lawful arrest also justify a brief detention incident to the arrest.  See Gerstein v. Pugh, 95 S. Ct. 854, 863 (1975).  Plaintiff was released within minutes of having been fingerprinted at the jail when it was realized that plaintiff was not the person who was the true subject of the arrest warrant.

immediately after finding unlawful drugs in a container in the vehicle in which Rodriguez was one of only two occupants -- were trying to determine whether Rodriguez was the person described in the warrant, a warrant charging the listed person with drug possession. See Patton, 822 F.2d at 699-700 (relying on fact that arrestee "was in an automobile rather than at home; if [the officer] had let him go it might have taken a long time to catch up with him again (if he was the 'real' [person listed in the warrant])" and "the edginess all policemen feel in confronting a criminal suspect at night on a highway" when concluding that no finder of fact could conclude that officer acted unreasonably in arresting wrong person for arrest warrant despite discrepancies).

Time was short in the situation facing Sgt. Farrell and Officer Szczepanski: a nighttime traffic stop. The officers had minutes to make their determination, not months or even days: Rodriguez soon had to be either arrested or let go. Cf. Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989) (concluding that sheriff's failure to investigate discrepancies in identity of person against whom he sought arrest warrant -- discrepancies of which he was aware three months before seeking the warrant -- could constitute constitutional violation sufficient to form foundation of section 1983 constitutional false arrest claim); Cannon, 1 F.3d at 1558 (seven day detention period). Given all the circumstances, the Constitution's guarantee against

"unreasonable" seizures was not violated by an estimate of height that was accurate within 5 inches.[16]

Put differently, we -- given the facts as Rodriguez presents them -- conclude, as a matter of law, that Sgt. Farrell and Officer Szczepanski made a "reasonable mistake" when they arrested Rodriguez pursuant to Heredia's warrant and, thus, committed no constitutional violation upon which to base a section 1983 constitutional false-arrest claim.[17]

---

[16] We can find only one circuit court opinion -- Rodriguez cites none -- actually holding an officer potentially liable for the mistaken arrest of someone pursuant to a valid arrest warrant for another. See Watts v. County of Sacramento, 256 F.3d 886 (9th Cir. 2001). But, Watts is very different from our case. Most important, Watts involved the entry into and an arrest in a home and, even more worrisome, a home that was not known to be the dwelling place of the person listed in the warrant.

Under the circumstances of this case, defining "reasonable mistake" to exclude the acts of Sgt. Farrell and Officer Szczepanski -- thereby creating a cause of action against them and subjecting them personally to possible monetary liability -- would likely deter future officers too much from making arrests in public places on valid warrants about which they do not have first-hand knowledge: the risk of error in identification, and then a lawsuit, would simply be too great. As a result, persons sought for crimes would, therefore, find it easier to evade capture. See Johnson, 680 F.2d at 41 ("If an officer executing an arrest warrant must do so at peril of damage liability under section 1983 if there is any discrepancy between the description in the warrant and the appearance of the person to be arrested, many a criminal will slip away while the officer anxiously compares the description in the warrant with the appearance of the person named in it and radios back any discrepancies to his headquarters for instructions.").

[17] Sgt. Farrell and Officer Szczepanski have not argued in this appeal that the pertinent arrest was consistent with the Federal Constitution because probable cause (even if no warrant had been involved) existed for the arrest, given that plaintiff was one of only two occupants of an automobile in which the police had just found unlawful drugs in a container that was also in the automobile. So, we do not address that issue. But for background, see United States v. Buckner, 179 F.3d 834 (9th Cir. 1999); Fernandez v. Perez, 937 F.2d 368 (7th Cir. 1991).

We, however, do treat the fact that plaintiff was riding in an automobile in which unlawful drugs had been found in a container to which plaintiff had access and had handled as a significant part of the totality of the circumstances of plaintiff's arrest. Plaintiff was not just

15

## 2. Clearly Established Law

In the alternative, we conclude that, given the law at the time of arrest, the unlawfulness of the arrest was not already clearly established. "A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." Marsh v. Butler County, 268 F.3d 1014, 1030-31 (11th Cir. 2001) (en banc) (quoting Lassiter, 28 F.3d at 1150). Furthermore, because Fourth Amendment qualified-immunity determinations turn on the reasonableness of an officer's acts in a certain set of facts, the Supreme Court recently stressed that the determination of whether a legal right was already clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156 (2001).

---

walking down the street and stopped because passing police officers thought he might fit some outstanding warrant. He was in a car that was carrying drugs, and he (to say the least) was of the same name, sex, race, and age as a person for whom a warrant for a drug crime was outstanding. It is the arrest in these circumstances that is before us. The warrant did not have to justify this arrest in a vacuum; something, at least, approaching (if not reaching) probable cause to arrest was established by plaintiff's having been in the car where drugs were being carried. So, the warrant -- with its substantial similarities between plaintiff and the person for whom the warrant was issued -- need not (and should not) be viewed alone: abstract and pure.

16

Assuming, arguendo, that Sgt. Farrell and Officer Szczepanski's mistaken arrest of Rodriguez was unreasonable in the constitutional sense and that Rodriguez, thus, has stated a claim for unconstitutional arrest, the constitutional violation -- at the time of the arrest -- was not already clearly established: Rodriguez cited to no case (nor can we find one) in this Circuit or from the United States Supreme Court or Florida Supreme Court that has ever held an officer, under any set of circumstances, liable for misidentifying an arrestee when executing a valid arrest warrant.

The cases that are factually closest to the instant case (and that conclude that an officer is, or may be, liable under section 1983) are Cannon v. Macon County, 1 F.3d 1558 (11th Cir. 1993), and Tillman v. Coley, 886 F.2d 317 (11th Cir. 1989). Both of these cases are, however, materially different from this case.

Cannon and Tillman share a fundamental distinction from our case: neither case involves an on-the-spot decision to arrest by an officer in the field. Cannon concluded that an official at a police station was liable for failing to identify correctly the plaintiff during seven days of incarceration under the official's care. Cannon, 1 F.3d at 1562-63. Cannon did not conclude that the officer, who executed the warrant (the validity of which was not challenged) in the field, was liable. Id. at 1561. Tillman deals with the application for an arrest warrant that the court

17

concluded was insufficient because the affidavit submitted to the magistrate lacked probable cause; Tillman decides nothing about the execution of a valid arrest warrant in the field. Tillman, 886 F.2d at 320-21. Thus, Cannon and Tillman are not like this case: they do not address situations involving an officer's execution of a valid arrest warrant in the field. Given the circumstances of the case at hand, the precedents cannot have clearly established the applicable law for the purposes of the qualified immunity defense. See generally Marsh, 268 F.3d at 1031-34 (explaining use of precedents to determine clearly established law).

Public officers need not err on the side of caution. Id. at 1030 n.8. And, "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir. 1993). At the time of the pertinent arrest, no precedent had decided that an officer committed a constitutional violation by mistakenly executing a valid arrest warrant against the wrong person. Closer to the point, no precedent had decided that the nighttime arrest, in conjunction with a traffic stop, of a person -- who had been riding in an automobile in which unlawful drugs were being carried, and who was admittedly within five inches of the height of a fugitive for which a valid warrant for arrest (for offenses including a drug

18

offense) was in existence and known to the arresting officers  -- violated the Federal Constitution when the arrested  person shared with the fugitive (1) similar birth dates, social security numbers, addresses, birth places and tattoos as well as (2) the identical name, sex, race and age.[18]  Therefore, we conclude that, if Sgt. Farrell's and Officer Szczepanski's mistake in arresting Rodriguez was not, as a matter of law, a "reasonable" one, it was, at least, an arguably reasonable one in the light of the unsettled, preexisting law.  See Marsh, 268 F.3d at 1030 n.8, 1031 n.9.  We must, therefore, reverse the district court's denial of qualified immunity to Sgt. Farrell and Officer Szczepanski.

B.  Excessive Force During the Arrest

---

[18]We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable (by which we, in the qualified immunity context, always mean every objectively reasonable) officer that what the defendant officer was doing must be "unreasonable" within the meaning of the Fourth Amendment.  See Priester v. City of Riviera Beach, 208 F.3d 919 (11th Cir. 2000).  See generally Marsh, 268 F.3d at 1031 n.9 (discussing means by which officers can be fairly and clearly warned).  But the case now before us is not one like that.

We conclude that the force used by Sgt. Farrell during his arrest of Rodriguez did not violate the Constitution. The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 394 (1989). But, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396. In the Eleventh Circuit, we recognize that the typical arrest involves some force and injury. See Nolin v. Isbell, 207 F.3d 1253, 1257-58 (11th Cir. 2000).

The evidence, in the light most favorable to plaintiff, shows that Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to the police station. The handcuffs were removed minutes after arrival at the police department. The handcuffing technique used by Sgt. Farrell is a relatively common and ordinarily accepted non-excessive way to detain an arrestee.

Plaintiff's orthopedic surgeon testified that the handcuffing was a "very serious, painful event," that resulted in the loosening of the internal surgical hardware, and caused the displacement of a key bone fragment. The resulting

complications included more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow.[19]

Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.  See Nolin, 207 F.3d at 1257-58 (concluding, as a matter of law, that force used during arrest, including handcuffing, was not excessive when force and resulting injury were minimal); Brissett v. Paul, 141 F.3d 1157 (4th Cir. 1998) (table) (concluding, as matter of law, that painful handcuffing with minimal injury not constitutional violation); Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (same); see also Martin v. Gentile, 849 F.2d 863, 869-70 (4th Cir. 1988) (concluding that force used, as a matter of law, was not excessive); Silverman v. Ballantine, 694 F.2d 1091, 1096-97 (7th Cir. 1982) (same).

This case is different from Nolin because Rodriguez' earlier surgery made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury and tragic results.  This distinction, however, is not important legally and does not preclude a conclusion that Rodriguez has shown no constitutional

---

[19] Given the loss of an arm, we are presented with the proverbial "hard case," that is, one in which one's natural sympathies are aroused by the plaintiff's plight.  We recall Justice Jackson's warning to judges: "We agree that this is a hard case, but we cannot agree that it should be allowed to make bad law."  FCC v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 216  (1946).

violation: no evidence has been presented that Sgt. Farrell knew of plaintiff's

recent elbow surgery or, more important, knew that handcuffing plaintiff would

seriously aggravate plaintiff's preexisting condition.[20]

---

[20] Rodriguez admits that he did not tell Sgt. Farrell that he had an injured arm before his arrest, and nothing outwardly indicated that Rodriguez' arm was injured after Rodriguez was outside the car. But, Rodriguez asks us to infer from the evidence he presented that Sgt. Farrell knew or should have known that Rodriguez' arm was already injured and required special treatment during the arrest. Rodriguez specifically argues that the evidence shows that, before Sgt. Farrell arrested him: (1) Rodriguez told Sgt. Farrell that he had just gotten out of the hospital because he (Rodriguez) had been in a motorcycle accident; (2) Sgt. Farrell briefly looked through Rodriguez' hospital records; and, (3) Sgt. Farrell was standing behind Ms. Foulkes' car when Rodriguez was in the car and still had his arm in a sling. From these three circumstances, Rodriguez says that one can reasonably infer that Sgt. Farrell knew about Rodriguez' injured arm and that the arm demanded special treatment. We disagree.

Sgt. Farrell testified flatly that he did not see Rodriguez' arm in a sling. And, the circumstances to which Rodriguez points are not inconsistent with Sgt. Farrell's sworn testimony. Rodriguez admits that the interior of Ms. Foulkes' car -- the area into which Sgt. Farrell, from his position behind the car, would have needed to have seen Rodriguez in his sling -- was "dark." Never does Rodriguez tell us how far behind the pertinent car Sgt. Farrell was standing. Never does Rodriguez say that he saw Farrell focus on him while Rodriguez was in the car wearing a sling.

Given the evidence in this record, Rodriguez relies on conjecture that the sling could have, and would have, been observed by a reasonable officer. See Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) ("[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."). Rodriguez cannot overcome contradictory direct evidence -- Sgt. Farrell's sworn testimony that he did not see the sling -- and raise a genuine issue of fact. We decline to accept Rodriguez' contended-for double inference (that the sling was observable and that Sgt. Farrell made, or a reasonable officer would have made, that observation in the context of what was occurring generally in the nighttime traffic stop and arrest of Ms. Foulkes) to prove that Sgt. Farrell saw, or should have seen, Rodriguez' arm in the sling. See generally Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355 (11th Cir. 1999) (concluding that inference that one person told a second person about a specific fact regarding a topic, based upon evidence that the first and second persons met and talked and evidence that the second person knew about the topic generally, was unreasonable speculation in the light of an affirmative denial of knowledge of the specific fact by the second person); Burrell v. Board of Trs. of Georgia Military Coll., 970 F.2d 785, 791 n.15 (11th Cir.1992) ("Considering that Burrell cannot offer evidence of the contents of Baugh's and Baggarly's meeting, that Baugh and Baggarly provide a reasonable and consistent explanation for their meeting, that Baugh and Baggarly flatly deny having discussed

22

We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act. What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time. See Silverman, 694 F.2d at 1096-97 (concluding that force used was not, as a matter of law, excessive even though

---

Burrell, only one fact can be inferred from their meeting: that the meeting took place. Any conclusion about the content of their discussion in contradiction to their testimony would qualify as speculation, not inference."); Daniels, 692 F.2d at 1326 (concluding jury could not reasonably draw inference that nursing home's negligent act of allowing patient to wander away from home was proximate cause of patient's death because inference was only supported by mere scintilla of evidence and conflicted with uncontradicted facts). See also Pennsylvania R.R. v. Chamberlin, 288 U.S. 333, 340-41, 53 S. Ct. 391 (1933) ("And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."). Thus, the evidence is insufficient to support a finding that Sgt. Farrell knew, or should have known, about Rodriguez' injured arm (and that the arm demanded special treatment) because Rodriguez had the arm in a sling at a time before his arrest.

Nor does Rodriguez' testimony that Sgt. Farrell briefly "looked" at Rodriguez' hospital records raise an inference that Sgt. Farrell knew, or should have known, about Rodriguez' injured arm and that the arm demanded special treatment. Rodriguez specifically testified that Sgt. Farrell "looked" at the records; he admits that Farrell did not "read" them. Rodriguez also provides no evidence tending to show specifically what the content of these hospital records would have been. Under the circumstances, this evidence, even combined with evidence that Rodriguez told Sgt. Farrell that he had just gotten out of the hospital after a motorcycle accident, is not enough to support an inference that Sgt. Farrell knew, or should have known, specifically that Rodriguez' arm was injured and that the arm demanded special care. Cf. Clover, 176 F.3d at 1355.

23

arrestee died of heart attack during arrest).  Under the circumstances of this case,

Sgt. Farrell's acts cannot rise to the level of a constitutional violation.[21]

REVERSED and REMANDED for further proceedings consistent with this

opinion.

---

[21] In the alternative, we conclude that Sgt. Farrell is entitled to qualified immunity on the excessive force claim.