[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-16054

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 05, 2002
THOMAS K. KAHN
CLERK

D. C. Docket No. 98-02814 CV-SH

KIM D. LEE,
f.k.a.
Kim D. White,

                                        Plaintiff-Appellee,


                           versus


LUIS FERRARO, individually and
in his official capacity as a
City of Miami Police officer,

                                        Defendant-Appellant.



_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 5, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and MILLS[*], District Judge.

_____

[*]Honorable Richard Mills, U.S. District Judge for the Central District of
Illinois, sitting by designation.

MARCUS, Circuit Judge:

In this civil rights case, Defendant Luis Ferraro, a police officer in the City of Miami, appeals the district court's denial of his motion for summary judgment on the basis of qualified immunity. Plaintiff Kim D. Lee claims, inter alia, that Ferraro violated her rights under the Fourth Amendment of the United States Constitution when he arrested her for improperly honking her car horn on a busy city street during rush hour and when he applied excessive force in carrying out the arrest. After thorough review, we conclude that Ferraro is entitled to qualified immunity on Lee's wrongful arrest claim, but hold that the police officer is plainly not entitled to qualified immunity on the excessive force claim.

I.

In conducting de novo review of the district court's disposition of a summary judgment motion based on qualified immunity, we are required to resolve all issues of material fact in favor of the plaintiff. See, e.g., Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998). "We then answer the legal question of whether the defendant[] [is] entitled to qualified immunity under that version of the facts." Thornton v. City of Macon, 132 F.3d 1395, 1397 (11th Cir. 1998). Indeed, we approach the facts from the plaintiff's perspective because "[t]he issues appealed here concern 'not which facts the parties might be able to prove, but, rather,

whether or not certain given facts showed a violation of clearly established law.'"

Sheth, 145 F.3d at 1236 (quoting Johnson v. Jones, 515 U.S. 304, 311, 115 S. Ct. 2151, 2155, 132 L. Ed. 2d 238 (1995)).  As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).  Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. See Skrtich v. Thornton, ___ F.3d ___,  (11th Cir. Jan. 29, 2002).

At approximately 6:00 p.m. on July 9, 1997, Lee, a twenty-nine year old African-American female, approximately 5'7" tall and 160 pounds, was driving home on Biscayne Boulevard from her job as a paralegal in the City of Miami, a municipality within Miami-Dade County.  While proceeding northbound in moderate to heavy traffic on a four-lane thoroughfare, Lee encountered a car stopped in her lane of travel, two or three car-lengths before the next traffic light. Officer Ferraro's police car was stopped in a travel lane next to the car on the passenger's side.  Because the car in front of her did not move despite the light being green, Lee honked her horn for the car "to go with the flow of traffic," and the car proceeded.  At this time, Ferraro yelled at her from his car, asking if she was with the passengers in the car that had been stopped.  Lee shook her head, said

3

no, and drove on. Ferraro then pulled his police cruiser behind her car and turned on his siren lights, so Lee pulled her car to the left side of the northbound lanes. She explained that she went to the left side because she was already in the left lane and could not "dart across" four lanes of traffic. After Lee had stopped her car, Ferraro motioned for her to pull her car into the parking lot of a gas station to her left, across the southbound lanes of traffic. Lee complied, and Ferraro parked directly behind her.

Ferraro, a 6'3", 190 pound male, came to the driver's side window and asked "what the hell was wrong" with her and "who the hell [she] thought [she] was," and, before Lee responded, asked for her driver's license. Lee started to reach down to get the bag containing her license, which was on the floor on the passenger's side of the front seat, asking Ferraro why he pulled her over. Ferraro responded that "he is the fucking boss around here, he asks all the questions, don't ask him questions, and things of that nature."

Before Lee could reach her bag, Ferraro, who had not asked her to get out of the car, pulled the door open. He then took out his retractable night stick and "put it in [her] face." As he did this, according to Lee, "he was saying things to the effect that he should kick my black ass, he is the boss, he can -- like just a whole lot of racial -- just a lot of words pertaining to -- black bitch." He called her "a

4

fucking black bitch.  He was saying he should kick my fucking ass.  If I was a man, he would kick my ass.  Things like that."  While screaming these words, Ferraro kept his night stick in Lee's face, and she remained seated in the car.

Ferraro then "grabbed" Lee's left wrist and "just pulled [her] out" of the car.  He pulled her with his hand still on her wrist, and then shoved her hand against her back.  As he pulled her out of the car, he said, "You are under arrest."  Once he had her outside the car, Ferraro "shoved" Lee against the car in front of the driver's side door.  Asked if she was shoved "face first against the car," Lee responded "[r]ight, like chest."  At this point, Lee explained, Ferraro "threw my hand on top of the hood and he frisked me, went through my pockets and things like that.  After he was done with that, then he put the handcuffs on."  Notably, she said that after the handcuffs were on and after she was secured, Ferraro "led me to the trunk of my car and slammed my head down onto the trunk and he kept spreading my legs with his foot."  Lee did not resist Ferraro at any time during this incident.[1]

---

[1]Ferraro offers a different account of the events.  He claims that Lee said, in response to his request for the driver's license, that "I don't have to show you shit," and that Lee refused to get out of the car when he asked her to do so.  Ferraro has also testified that Lee struggled with him when he removed her from the car and that she pushed him once she was standing outside the vehicle.  Lee denies these allegations, and, as we have noted, her denials must be accepted in analyzing a claim of qualified immunity on summary judgment.

5

Ferraro called for back-up, and Lee remained standing with her head on the trunk of her car. Other police officers arrived and, with Ferraro, began searching her car and the items in it. When Ferraro saw a Coast Guard identification card that Lee possessed because her husband was in the Coast Guard, he said, "You are in the Coast Guard. Oh, I can't wait for your commander to get a whiff of this, to see that you have been arrested. Wait till he sees this." Ferraro never explained to Lee why she was being arrested. When the other officers inquired, Ferraro said "assault."

After her car was towed away and she waited about forty-five minutes or an hour, Lee was taken by Officer Jesse Wilkins and his partner Officer Wilson to the police station, where she was fingerprinted. There, a police official behind the counter read Ferraro's report on the incident and said "something to the effect that these are some really lame charges." Lee was then taken to a second facility, where she was put in a cell. Officer Wilkins asked her about bail and told her that she would remain in custody until the following morning. Several hours later, Lee was taken to a third facility on a bus with other prisoners. At this facility, she was strip searched, given a medical examination, and then placed in a large room with cots. She remained there until the next morning, when Officer Wilkins, whom she had not met before the previous evening's incident, posted bond for her.

6

On July 12, 1997, three days after the incident, Lee went to the walk-in center at Memorial Regional Hospital in Pembroke Pines "for bruises and aching wrists." Dr. Jose Suarez, a medical doctor, observed "mild tenderness to palpation" in Lee's wrist area. The pain was slightly greater in the right wrist than the left. Suarez diagnosed " bilateral wrist trauma" and also noticed some median nerve compression in her right wrist. Because of this compression, he reported that Lee might be suffering from carpal tunnel syndrome because of the trauma. Suarez explained in his deposition that the injuries were fully consistent with Lee's account of the encounter with Ferraro. In particular, he opined that tissue injury could compress the nerve in the wrist and thus cause pain and tenderness throughout the arm. This compression could be caused by the hard grabbing of a handcuffed wrist or by being grabbed and pulled out of a vehicle. This condition, he explained, "could be permanent." Suarez ordered splints for Lee's wrists and recommended that she apply ice to the wrist and take over-the-counter pain medication. Suarez referred her to a primary care physician to look into the carpal tunnel issue. Lee's wrist injuries "continued to bother [her] and cause [her] substantial pain for several months."

In addition to her physical injuries, Lee said she suffered from psychological effects as a result of the incident: "I was depressed. I just couldn't get it together,

7

short attention span. I was trying to alleviate the fear of every time you see a cop, you get extremely nervous." Even after she moved from Miami to Philadelphia, the fear continued: "You get very nervous that they might pull you over and what they might do to you." As recently as June 1999, Lee still became depressed at times, and the effects of the incident had caused difficulty in her marriage. Dr. Shirley Suarez, a psychologist, testified that when she examined Lee twice in October 1997, Lee was suffering psychological trauma relating to the incident, especially the verbal abuse from Ferraro, the strip search, and the overnight detention in jail. Suarez, who diagnosed Lee as suffering from post-traumatic stress disorder, noted that Lee "feels 'numb' and 'not normal' since the incident and that she is having difficulty concentrating at work." Dr. Anastasio Castiello, a psychiatrist who examined Lee on behalf of the defendants, reported in January 2000 that Lee still feels "nervous" around police officers, fearing for both herself and her husband. During her session with Dr. Castiello, Lee was "somewhat anxious," and "became tearful and agitated."

On her arrest form, Lee was charged with battery on a police officer, failure to have a valid driver's license, resisting arrest with violence, and failure to obey a police officer. Ferraro also issued a traffic citation for improper use of her car horn under Section 316.271(1) of the Florida Statutes. On August 8, 1997, the charge

for failure to have a valid driver's license was nolle prossed and the charges for failure to obey a lawful order and improper use of the horn were dismissed by the state court. On October 27, 1997, two felony charges for battery on a police officer and resisting arrest were nolle prossed after the Assistant State Attorney assigned to the case concluded that the case against Lee was flawed.[2]

Lee filed this § 1983 civil rights lawsuit in a Florida state court on October 27, 1998, and, soon thereafter, the defendants removed the case to federal court. In the first count of her amended complaint, Lee charged that Ferraro was liable for damages under § 1983 for violating her Fourth Amendment rights to be free from an unreasonable stop, wrongful arrest, and excessive force.[3] In her second claim, Lee alleged that the City of Miami was liable under § 1983 for failing to supervise

---

[2]As part of her evidentiary submission, Lee has presented a lengthy account of a considerable number of complaints against Ferraro for abusive treatment. The alleged incidents include reprimands for improperly striking a citizen in the head with a flashlight, lying, and discourtesy, including abusive language. Ferraro was also disciplined for pushing an African-American female during a dispute, and he has been the subject of three other abuse complaints from African-American women. These past incidents and allegations are not relevant to this Court's Fourth Amendment or qualified immunity analysis, which, as discussed below, looks only at objective reasonableness, not the subjective motivations of the public official. See discussion infra, note 7.

[3]Although the amended complaint lists a number of alleged constitutional violations, the district court properly clarified the complaint as alleging only violations of the Fourth Amendment. Neither party disputes the district court's characterization.

and discipline abusive police officers, and in her third claim, Lee said that Ferraro committed the tort of battery in violation of Florida law.

The district court denied Ferraro's motion for summary judgment on the basis of qualified immunity on the wrongful arrest claim, held that the excessive force claim was subsumed within the wrongful arrest, and granted Ferraro's motion for summary judgment regarding the lawfulness of the initial stop. Specifically, the court concluded that while Lee's honking of her horn provided reasonable suspicion for the stop, the law clearly established that an officer could not carry out a custodial arrest for this minor violation, thereby depriving Ferraro of qualified immunity. The district court did not address separately the excessive force claim because, under Eleventh Circuit law, "a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000) (citation omitted). As for the other claims, the district court denied summary judgment on the ground that legitimate questions of fact remained regarding whether the City had a pattern and practice of failing to discipline abusive officers such as Ferraro and whether Ferraro acted with the intent necessary to support the state battery claim.

II.

The only issues properly before us in this interlocutory appeal are whether Ferraro is entitled to qualified immunity on Lee's claims that he violated her Fourth Amendment rights by (1) arresting her for the horn violation and (2) using excessive force during the incident.

Qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)) (additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, see Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001). Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

11

In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. In this case, there can be no doubt that Ferraro was acting in his discretionary capacity when he arrested Lee.

Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. See id. The Supreme Court recently set forth a two-part test for evaluating a claim of qualified immunity. As a "threshold question," a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." Id. This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id.; see also Marsh v. Butler County, 268

F.3d 1014, 1031-33 (11th Cir. 2001) (en banc). We conduct the <u>Saucier</u> analysis separately for each of Ferraro's two qualified immunity claims.

A.

Ferraro's claim that he is entitled to qualified immunity for Lee's custodial arrest can be resolved under the first part of the <u>Saucier</u> test, as the facts alleged do not show the violation of a constitutional right. Simply put, the Supreme Court's recent decision in <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001), compels the conclusion that the arrest did not violate the Fourth Amendment. In <u>Atwater</u>, a Texas woman was arrested and taken into custody for failing to secure her children with seatbelts in the front seat of her truck, driving without her own seatbelt fastened, driving without a license, and failing to provide proof of insurance. Although the failure to put seatbelts on the children was a misdemeanor punishable only by fine under Texas law, the Court determined that the arrest for that offense did not violate the Fourth Amendment. After reviewing the long history of police authority to arrest individuals for misdemeanors, the Court held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." 121 S. Ct. at 1557.

13

Ferraro had probable cause to believe that Lee committed a criminal offense under a Miami-Dade County noise ordinance. Section 21-28 of the County's Code of Ordinances prohibits

> [t]he sounding of any horn or signaling device on any automobile, motorcycle, bus or other vehicle on any street or public place of the County, except as a danger warning; the creation of an unreasonably loud or harsh sound, and the sounding of any such device for an unnecessary and unreasonable period of time.

Miami-Dade County Code of Ordinances, § 21-28(a). For probable cause to exist, both federal and Florida law say that an arrest must be objectively reasonable based on the totality of the circumstances. See Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Id. (quoting Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995)). Although probable cause requires more than suspicion, it "does not require convincing proof," id. (quoting Bailey v. Bd. of County Comm'rs of Alachua County, 956 F.2d 1112, 1119 (11th Cir. 1992)), and "need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." Id. (quoting State v. Scott, 641 So. 2d 517, 519 (Fla. Dist. Ct. App.

14

1994). Here, Lee does not deny that she honked her horn when the car in front of her did not move. A prudent law enforcement officer in Ferraro's position could have believed that Lee was honking her horn for a purpose other than signaling danger, thus violating the Miami-Dade County noise ordinance.

While we conclude that Ferraro had probable cause to arrest Lee, we add that even if there were not actual probable cause, Ferraro undoubtedly had <u>arguable</u> probable cause, which is "all that is required for qualified immunity to be applicable to an arresting officer." <u>Scarbrough v. Myles</u>, 245 F.3d 1299, 1302 (11th Cir. 2001). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." <u>Id</u>. (quoting <u>Redd v. City of Enterprise</u>, 140 F.3d 1378, 1382 (11th Cir. 1998) (internal citations omitted)). In determining whether arguable probable cause exists, "[w]e apply an objective standard, asking 'whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'" <u>Vaughan v. Cox</u>, 264 F.3d 1027, 1036 (11th Cir. 2001) (quoting <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11th Cir. 1997)). "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting

15

officers into prosecutors." Scarbrough, 245 F.3d at 1302-03.  Here, there is no question that a reasonable officer could have believed that Lee violated the law by honking her horn for a purpose other than warning of danger.

The fact that Ferraro did not cite the specific Miami-Dade County noise ordinance either orally or in his arrest report is irrelevant to our inquiry.  Quite simply, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." Bailey, 956 F.2d at 1119 n.4 (holding that arrest was proper based on bribery, unlawful compensation, and unlawful possession of money in jail even though arrest report reflected only conveying tools into jail to aid escape, for which defendant was not charged) (citing United States v. Saunders, 476 F.2d 5, 7 (5th Cir. 1973)).  Indeed, "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." Saunders, 476 F.2d at 7 (holding that arrest was valid based on marijuana possession even though agents making arrest relied only on charges of harboring and concealing a fugitive, for which there was no probable cause) (citations omitted).

When an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling

16

Supreme Court precedent to effectuate a full custodial arrest. See Atwater, 121 S. Ct. at 1557. Lee argues, however, that her case is not covered by Atwater because Florida law, unlike the Texas law at issue in that case, does not permit full custodial arrests for violations of noncriminal local laws, such as traffic ordinances. See Thomas v. State, 614 So.2d 468, 471 (Fla. 1993). What this argument ignores, however, is that the Dade County noise ordinance pursuant to which Lee was detained is a criminal law. Because Section 21-28 does not list a specific penalty, its enforcement is governed by Section 1-5 of the Miami-Dade County Code of Ordinances:

> Unless otherwise specifically provided herein, any person violating any of the provisions of this Code shall be punishable by a fine not to exceed five hundred dollars or by imprisonment in the county jail for a period not to exceed sixty days, or by both such fine and imprisonment, in the discretion of the court having jurisdiction over the cause.

Miami-Dade County Code of Ordinances, § 1-5(a). The prospect of incarceration plainly makes violating the horn ordinance a crime. See generally Fla. Stat. Ann. § 125.69(1) (stating that violations of county ordinances carrying possible jail sentences "shall be prosecuted in the same manner as misdemeanors are prosecuted").[4]

---

[4]We need not address Lee's argument that the Miami-Dade ordinance improperly conflicted with the Florida horn honking statute. Even if the ordinance was in some way constitutionally invalid under Florida law, Ferraro had probable cause to believe that it was

Under both Atwater and Florida law, therefore, a full custodial arrest is allowed when a misdemeanor has been committed. See Fla. Stat. Ann. § 901.15(1) ("A law enforcement officer may arrest a person without a warrant when . . . [t]he person has committed a felony or misdemeanor . . . in the presence of an officer."). The arrest in this case was lawful, and Lee cannot prevail on a Fourth Amendment claim based on Ferraro's decision to take her into custody. Accordingly, Ferraro is entitled to qualified immunity on Lee's wrongful arrest claim and summary judgment is appropriate under the first prong of Saucier.[5]

B.

_____

violated, thus making the stop and the ensuing arrest lawful. See, e.g., Michigan v. DeFillippo, 443 U.S. 31, 37-38, 99 S. Ct. 2627, 2632, 61 L. Ed. 2d 343 (1979) (refusing to invalidate arrest and search because probable cause existed and officer had no reason to know, under controlling precedent, that ordinance supporting arrest would later be declared unconstitutional). We also find no merit in the claim that Ferraro, as a City of Miami officer, lacked authority to arrest Lee for violating a County ordinance, see City of Miami Beach v. Valeriani, 137 So. 2d 226, 227 (Fla. 1962) (explaining that city officer had authority to make arrest for violation of Dade County ordinance within city's boundaries), or in the claim that the Miami-Dade ordinance is somehow invalid because many people in the County honk their horns without being arrested.

[5]We note that even if Lee could somehow meet the first prong of Saucier (and in light of Atwater this seems to be an insuperable burden), she would not succeed under the second prong either because no law from the United States Supreme Court, the Florida Supreme Court, or this Court clearly established at the time of the incident that an officer could not arrest an individual for violating a county's criminal ordinance. See Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997) ("In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.") (internal quotations omitted).

18

Once summary judgment is granted in Ferraro's favor on the wrongful arrest claim, Lee's claim that the officer used excessive force must be analyzed independently. See Jackson, 206 F.3d at 1171.[6]  In conducting this inquiry, we must first decide whether, taken in the light most favorable to Lee, the facts show that Ferraro's conduct violated a constitutional right; then, we determine whether the right violated was clearly established. See Saucier, 121 S. Ct. at 2156.  As a result of this analysis, we conclude that Ferraro is not entitled to qualified immunity on the excessive force claim.

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest. See Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989).  In order to determine whether the amount of force used by a police officer was proper, a court must ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." Willingham, 261 F.3d at 1186.  The Supreme Court has held that "[d]etermining

---

[6]Because the record on this claim has been fully developed, we see no reason to remand the matter to the district court for an examination of whether Ferraro is entitled to qualified immunity on the excessive force claim.  This approach is altogether consonant with the principle that qualified immunity claims must be assessed by the courts "as early in the lawsuit as possible." GJR Invs., 132 F.3d at 1370.

whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S. Ct. at 1871 (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985) (internal quotations omitted)).  Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. at 1871-72 (citing Terry v. Ohio, 392 U.S. 1, 22-27, 88 S. Ct. 1868, 1880-83, 20 L. Ed. 2d 889 (1968)).

The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id., 109 S. Ct. at 1872.  See also, e.g., Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between

the need and amount of force used, and (3) the extent of the injury inflicted).[7]

Graham dictates unambiguously that the force used by a police officer in carrying

out an arrest must be reasonably proportionate to the need for that force, which is

measured by the severity of the crime, the danger to the officer, and the risk of

flight.

Based on Lee's account of the facts, it is abundantly clear to us that Ferraro

used force that was plainly excessive, wholly unnecessary, and, indeed, grossly

disproportionate under Graham.  First, although Atwater compels the decision that

Ferraro did have probable cause to arrest Lee, at least on this fact pattern, it is

difficult to imagine a less significant crime than honking one's horn on a busy

downtown thoroughfare.  Since Graham establishes generally that more force is

appropriate for a more serious offense and less force is appropriate for a less

---

[7]Although this Circuit's test previously included a subjective prong examining whether the force was applied maliciously, see, e.g., Leslie, 786 F.2d at 1536, this factor has been eliminated from the analysis by Graham and other cases establishing that the excessive force inquiry should be completely objective, therefore excluding consideration of the officer's intentions. See Nolin v. Isbell, 207 F.3d 1253, 1257 n.3 (11th Cir. 2000) (referring to subjective element of excessive force test as "invalidated"); see also Graham, 490 U.S. at 397-99, 109 S. Ct. at 1872-73 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").  The other three elements of the Leslie test are still valid after Graham. See, e.g., Jackson, 206 F.3d at 1170 n.18.

serious one, this factor strongly weighs in favor of Lee. The second Graham factor also works in Lee's favor, as there is absolutely no evidence indicating that Lee posed any threat to the arresting officer or to anyone else. Similarly, when the facts are construed in the light most favorable to the plaintiff, there is no indication that Lee actively resisted or attempted to flee. Even though Ferraro had lawful authority to effect a custodial arrest and to use a reasonable amount of force to subdue and secure Lee, we can discern no reason, let alone any legitimate law enforcement need, for Officer Ferraro to have led Lee to the back of her car and slammed her head against the trunk after she was arrested and secured in handcuffs. At this point, Lee clearly posed no threat at all to the officer or to anyone else and no risk of flight. Under all of the factors set forth in the governing case law, the facts viewed in the light most favorable to Lee plainly show that the force used by Ferraro after effecting Lee's arrest was unnecessary and disproportionate. Accordingly, under the first prong of the Saucier test, Lee has made a showing of excessive force in violation of the Fourth Amendment.

Having concluded that Lee has made a sufficient showing of excessive force, the second step in the Saucier analysis requires us to determine whether Ferraro is nonetheless entitled to qualified immunity on the ground that the law had not clearly established at the time of the incident that such force was excessive. There

22

are two ways for a party to show that the law clearly established that a particular amount of force was excessive. The first is to point to a "materially similar case [that has] already decided that what the police officer was doing was unlawful." Willingham, 261 F.3d at 1187. Because identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." Priester, 208 F.3d at 926 (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)). Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in Graham and our own case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Id. (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993)).

Simply put, the grossly disproportionate force used in this case was clearly established as a constitutional violation because no reasonable officer could have believed that Ferraro's actions were legal. Even though Ferraro undoubtedly possessed the lawful power to effect a custodial arrest and secure Lee with handcuffs, a reasonable officer could not possibly have believed that he then had

23

the lawful authority to take her to the back of her car and slam her head against the trunk <u>after</u> she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed. Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose.

We recognized this principle in <u>Slicker v. Jackson</u>, 215 F.3d 1225 (11th Cir. 2000), where we denied qualified immunity to police officers who arrested the plaintiff for disorderly conduct, placed him in handcuffs, and then, after he had been fully secured, slammed his head into the pavement and kicked him in the leg, head, and back. <u>See</u> <u>id</u>. at 1227. In reaching our decision in <u>Slicker</u>, we explained that the evidence taken in the light most favorable to the plaintiff was "sufficient to raise a question of fact as to whether the officers' actions constituted excessive and not de minimis force." <u>Id</u>. at 1233. <u>See also</u> <u>Priester</u>, 208 F.3d at 926-27 (denying qualified immunity in light of clearly excessive force to officer who allowed police dog to attack arrestee who was already subdued and lying on the ground); <u>Smith</u>, 127 F.3d at 1418-20 (denying qualified immunity in excessive force case to officer who broke arm of individual who "docilely submitted" to officer's request to "get down"). As in <u>Slicker</u>, <u>Priester</u>, and <u>Smith</u>, the peculiar facts of this case are "so far beyond the hazy border between excessive and acceptable force that [the officer]

24

had to know he was violating the Constitution even without caselaw on point." Smith, 127 F.3d at 1419.

Moreover, the facts alleged by Lee take this case outside the realm of cases in which we have granted qualified immunity on the ground that the force used and injury sustained were de minimis. First, the crime at issue in this case was undeniably less significant than the crimes in any of the other cases we have considered. See Rodriguez v. Farrell, -- F.3d --, 2002 WL 121940, at *1 (11th Cir. Jan. 30, 2002) (cocaine possession); Nolin, 207 F.3d 1253, 1254-55 (public fighting); Jones v. City of Dothan, 121 F.3d 1456, 1458 (11th Cir. 1997) (harassment); Gold v. City of Miami, 121 F.3d 1442, 1444 (11th Cir. 1997) (engaging in disorderly conduct by yelling at police officers); Post, 7 F.3d at 1555-56 (repeated failure to abide by building safety codes). Even more importantly, none of our other opinions granting qualified immunity have involved the infliction of such severe and disproportionate force after the arrest had been fully effected, the arrestee completely secured, and all danger vitiated. See Rodriguez, 2002 WL 121940, at *7 (injury occurred during handcuffing); Nolin, 207 F.3d at 1255-57 (plaintiff grabbed, thrown against van, and handcuffed before arrest); Jones, 121 F.3d at 1458, 1460-61 (plaintiff slammed against wall and searched as officers carried out arrest); Gold, 121 F.3d at 1446-47 (minor injury caused solely by tight

handcuffs); <u>Post</u>, 7 F.3d at 1556, 1559-60 (arrestee pushed against wall when continuing to speak despite being ordered by officer to stop talking).

In addition, the fact that Lee did not suffer greater injury to her head as a result of it being slammed against the trunk of a car does not alone render the force used <u>de minimis</u>. As this Court recently recognized in <u>Rodriguez</u>, "[w]e do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act." 2002 WL 121940, at *7. Just as ordinary, reasonable force "does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time," <u>id</u>., objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm. Slamming the head of a handcuffed, subdued arrestee against the trunk of a car is objectively unreasonable and clearly unlawful. This conclusion seems to us to be even more self-evident where, as here, the crime involved nothing more than the improper use of a horn on a busy thoroughfare during rush hour traffic in a large metropolitan community.

As the Supreme Court and this Circuit have recognized, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1872

26

(citation omitted).  Indeed, "the <u>typical</u> arrest involves some force and injury," <u>Rodriguez</u>, 2002 WL 121940, at *7 (citing <u>Nolin</u>, 207 F.3d at 1257-58) (emphasis added), and the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes.  Because <u>Graham</u>'s reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments," <u>Graham</u>, 490 U.S. at 396-97, 109 S. Ct. at 1872, and because "[g]overnment officials are not required to err on the side of caution," <u>Marsh</u>, 268 F.3d at 1031 n.8., qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful, <u>see</u> <u>Saucier</u>, 121 S. Ct. at 2158. However, qualified immunity is not appropriate when the <u>Graham</u> analysis yields an answer that is clear beyond all doubt.  This is such a case.

In reaching our decision, we are applying the clear and obvious principle that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ the severe and unnecessary force allegedly used here.  Because Ferraro's actions were so plainly unnecessary and disproportionate, no reasonable officer could have had a "mistaken understanding as to whether [the] particular amount of force [was] legal in the circumstances."

<u>Saucier</u>, 121 S. Ct. at 2158. Ferraro is therefore not entitled to qualified immunity on Lee's excessive force claim.

III.

In light of the Supreme Court's decision in <u>Atwater</u>, the district court's denial of summary judgment on Lee's wrongful arrest claim must be reversed. However, Ferraro is not entitled to summary judgment on the basis of qualified immunity on the now-distinct part of the Fourth Amendment claim alleging excessive force. Accordingly, we remand for further proceedings consistent with this opinion.

REVERSED IN PART, and REMANDED.