[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16841
Non-Argument Calendar
_____

D.C. Docket No. 3:14-cv-01034-MHH


JAMES STEVEN SCOTT,
CAROLYN G. SCOTT,

Plaintiffs-Appellees,

versus

CITY OF RED BAY, ALABAMA,

Defendant,

KYLE PALMER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 19, 2017)

Before WILLIAM PRYOR, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Sergeant Kyle Palmer of the Police Department of Red Bay, Alabama, appeals the denial of summary judgment against James and Carolyn Scott's complaint that alleged the violation of James's civil rights, *see* 42 U.S.C. § 1983, and assault and battery under state law. James questioned Palmer's authority to conduct an investigation outside the city limits of Red Bay, and Palmer arrested James for obstructing governmental operations and resisting arrest. The district court denied Palmer qualified immunity from the Scotts' claim of excessive force and statutory immunity from their claim of assault and battery. We affirm the denial of qualified immunity.

## I. BACKGROUND

A mother reported that her minor daughter had disappeared while visiting her father in Red Bay. Officers of Red Bay spoke to the father, who stated that the girl might have visited the Hurricane Creek Missionary Baptist Church with some neighbors. The church is outside the city limits of Red Bay but within the same county, so when a county officer was unavailable to investigate, Chief Janna Jackson instructed Palmer to visit the church. Palmer confirmed that the child was safe and began to make arrangements for her father's neighbors to take her home.

James, a deacon of the church, interrupted the conversation between Palmer

2

and the neighbors. James asked, "What's going on?," and Palmer responded that he had the situation under control and for James to "[g]et back up yonder and shut up." James questioned whether Palmer was "out of [his] jurisdiction." Palmer replied that he could "go anywhere [he] want[ed] to go," and James retorted that there was "a county sheriff that . . . works this part of the county." Palmer pushed James away, but James stepped back towards Palmer and restated, "[y]eah, but . . . we got county law down here." Palmer announced that he was placing James under arrest and fastened a handcuff on James's right wrist.

What happened during the next five to ten minutes is in dispute. According to Palmer, James tugged his right arm, which caused Palmer to lose his balance and to topple onto Scott. The two men landed on a gravel driveway. James's left arm was under his body, so Palmer straddled James's back, ordered James to stop resisting and to relinquish his arm, and pulled James's left shoulder. James said that he would surrender his left arm if Palmer would get off him. In the meantime, several congregants encircled the two men and began shouting. Palmer felt a tug on the back of his shirt and displayed his Taser until the congregants widened their circle. A county officer arrived, persuaded James to relinquish his left arm, and helped him to stand.

According to the Scotts and other witnesses, Palmer used excessive force against James after he asked Palmer to loosen the bracelet on his right wrist.

3

Palmer forced James to the ground by kicking out his legs, put a knee to his back, and pressed his face in the dirt. James testified that he was unable to produce his left arm to be handcuffed because it was pinned underneath him and that Palmer ignored James's complaints that he could not breathe. Some congregants testified that they tried to explain to Palmer that James had health problems.

After the local officer removed James's handcuffs, friends treated abrasions on James's face and his right wrist, both of which were bleeding, in part because he took blood-thinning medicine. James also had contusions on his wrist and elbow. James, who also suffered from chronic obstructive pulmonary disease, emphysema, problems with his back, and had undergone surgery on his stomach, was transported to the hospital by ambulance.

The next day, James's regular physician recorded abrasions on James's arms, bruising on the right side of his rib cage, and sensitivity in his chest wall. James also complained of intermittent numbness in his right thumb and pain in his right foot and ankle. The bruises remained visible for several weeks, and James underwent physical therapy to treat his foot.

Palmer charged James with obstructing governmental operations and resisting arrest, both misdemeanors. A grand jury in Alabama indicted James for resisting arrest, but it no billed the charge of obstructing governmental operations. On James's motion, a state court dismissed the charge of resisting arrest.

## II. STANDARD OF REVIEW

We review *de novo* the denial of summary judgment based on qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To make that determination, we construe all facts and draw all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Lee*, 284 F.3d at 1190.

## III. DISCUSSION

Palmer challenges the denial of qualified and statutory immunity. Palmer argues that he is entitled to qualified immunity because he used de minimis force on "an unsecured arguably-resisting arrestee." Palmer also argues that the Scotts produced no evidence of unlawful conduct that would strip him of statutory immunity.

We agree with the district court that the disputed facts made summary judgment inappropriate. The Scotts' evidence creates jury issues about Palmer's use of force and the amount of force he used. Palmer contends that his use of force was minimal, but the Scotts' offered evidence that Palmer unreasonably manhandled James. The district court correctly evaluated Palmer's motion for summary judgment by "resolv[ing] all issues of material fact in [the Scotts']

5

favor." *Lee*, 284 F.3d at 1190.

The district court did not err by denying Palmer qualified immunity. An officer is ineligible for qualified immunity if his "conduct . . . violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Fourth Amendment encompasses the right to be free from the use of excessive force during an arrest. *Lee*, 284 F.3d at 1197. An officer has the right to use some degree of physical force to make an arrest, but the force used "must be reasonably proportionate to the need for that force." *Id.* at 1198 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). We measure the need for force based on the severity of the suspect's offense, any danger posed to the officer, and the suspect's resistance to arrest or attempts to flee. *Graham*, 490 U.S. at 396. Force is excessive when the amount and degree surpass what is "necessary in the situation at hand." *Lee*, 284 F.3d at 1197. Assuming, as we must, that James was not resisting arrest for a minor offense, the acts of shoving him to the ground, kneeling on his back, pressing his face into the ground, and ignoring his assertions that he could not produce his arm for handcuffing and could not breathe were excessive.

Palmer argues that his use of force was de minimis and insufficient as a matter of law to support a claim for excessive force, but we disagree. Force may be considered reasonable in one setting but unreasonable in another. To be sure, in

other cases we concluded that officers did not violate the Fourth Amendment by pushing a woman down and pinning her to the ground for up to ten minutes to "exercise unquestioned command" of the curtilage of a house being searched for an illegal substance, *see Croom v. Balkwill*, 645 F.3d 1240, 1252–53 (11th Cir. 2011), or by breaking up a violent fistfight by grabbing a suspect from behind, throwing him against a van, holding his head, kneeing him in the back, and searching his groin area before applying handcuffs, *see Nolin v. Isbell*, 207 F.3d 1253, 1255, 1258 (11th Cir. 2000). But Palmer did not confront the resistance or kinds of hazards faced by the officers in *Croom* and *Nolin*.

Palmer cites *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002), for the proposition that "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal," *id.* at 1351, but this case involved more than handcuffing. An officer may not use force disproportionate to the amount required to secure a suspect. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 739 (11th Cir. 2010) (concluding that officer was not entitled to qualified immunity when he used pepper spray to subdue a suspect who was not resisting arrest for a minor offense and then threw her to the ground before applying handcuffs). "What we consider . . . is what an objectively reasonable officer in [Palmer's] situation would have believed, taking as true [James's] testimony." *Id.* Based on James's account of the incident, Palmer did not encounter any danger or

physical resistance that required him to escalate his use of force to finish handcuffing James.

The district court also did not err by denying Palmer statutory immunity. Under Alabama law, an officer is stripped of statutory immunity if he "act[s] willfully, maliciously, fraudulently, or in bad faith." *Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003) (quoting *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)). Those states of mind might be ascribed to an unjustified infliction of force. And in Alabama, an officer "may be held liable" for using excessive force during an arrest. *Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995); *see Brown*, 608 F.3d at 742. The district court did not err when it ruled that James's version of events "show[ed] that Sergeant Palmer used more force than was necessary" to arrest James. As the district court stated, that Palmer "act[ed] willfully, maliciously, or in bad faith [could be inferred from him] t[aking] [James's] legs out and pinn[ing] him to the ground."

## IV. CONCLUSION

We **AFFIRM** the denial of qualified immunity.