WILLIAMS, District Judge, Dissenting in Part: On October 17, 2012, the police entered Brenda Van Cleve’s home to execute a search warrant. The officers were informed during the pre-execution briefing that there were no known weapons or threats within the residence. Once inside, Officers Rutherford, Horsley, and Whitener proceeded to the living room, where they encountered Van Cleve’s husband, Daniel Hammett. Fifteen to thirty seconds later, Hammett—who was unarmed and not the subject of the search- warrant or a target in the underlying investigation— was dead, shot once in the hand and then fatally in the back. Those are the undisputed facts of this case.[1] The question before the Court is whether the Defendant Officers’[2] decision to use deadly force was objectively reasonable based on the circumstances of this case, when the evidence available is viewed in the light most favorable to the Plaintiff. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002) (“[i]n conducting de novo review of the district court’s disposition of a summary judgment motion based on qualified immunity, we are required to resolve all issues of material fact in favor of the plaintiff.”); Thornton v. City of Macon, 132 F.3d 1395, 1397 (11th Cir.1998) (After taking the facts in the light most favorable to Plaintiff “[w]e ... answer the legal question of whether the defendant ][is] entitled to qualified immunity under that version of the facts.”). The evidence in this case does not conclusively .establish what took place in the moments leading up to the shooting of. Hammett.[3] But Plaintiff argues that, under the most favorable interpretation of the evidence presented, a reasonable jury could make the following findings that would defeat summary judgment. I agree. Disputed Issues of Material Fact A. The Manner in Which Hammett Approached The Officers First, a jury could find that Hammett did not pose an immediate threat that would justify the use of deadly force as he approached the officers. Officer Horsley testified that when the officers entered the living room and announced their presence, Hammett exited one of the bedrooms, “walkfed] out in the hall and stopped for a second.” He then started walking down the hallway quickly toward the officers. Specifically, Horsley' recalled that “[i]t appeared that he was trying, instead of coming straight at me, he was trying to get to one side or the other” and that he “couldn’t remember” if Hammett was still advancing towards him when Hammett raised his hands.[4] Whitener similarly testified that Hammett “walked at a fast pace” down the hallway toward the officers. Horsley went on to state that, as Hammett approached, he took a step toward Hammett with his gun at “high ready” to “try to engage him,” and instructed Hammett to put up his hands. He then lowered his gun slightly as he reached for Hammett, at which point Hammett raised his hands. Whitener also observed that Hors-ley was “grabbing towards Mr. Hammett’s hands” when Hammett’s hands “came up.” When asked whether, “as the hands came up, [she saw] ... clenched fists or [ ... ] actually s[aw] an object,” Whitener said “No. I couldn’t—I don’t know. I didn’t see any specific clenched "fist or—I don’t know if I—I don’t really recall if I saw anything, if it was—because it was dark.” With regard to the manner in which Hammett raised his hands, Officer Whitener testified that she thought that both of Hammett’s hands were up. Officer Horsley acknowledged that Hammett raised his right hand but testified that he does not recall what Hammett was doing with his left hand." The forensic evidence, however, shows that the first bullet fired at Hammett grazed the lateral side of Hammett’s left index finger but did not strike his body and lodged in the wall 52 inches above the ground. According to Hammett’s driver’s license he was five feet two inches (62 inches) tall.[5] Based on this evidence, a reasonable jury could find that when Hammett approached Horsley his hands were up—at least 52 inches above the ground-in seeming compliance with Officer Horsley’s instructions.[6] B. The Object in Hammett’s Hand Second, a jury could find that Hammett was unarmed, and that the officers did not believe that Hammett had a deadly weapon in his hand at the time they shot him. Horsley stated that, once Hammett exited the bedroom, he saw Hammett move something from his left hand to his right. He was shining his flashlight at Hammett’s hands but “was not able to see an object in his hand at that point.” Whitener also stated that “[d]uring th[at] time, [she] didn’t know what was in Hammett’s hand” and, moreover, that she couldn’t recall if she “could tell if he had an object and was holding his hands like he had something in his hands.” Initially, Horsley thought Hammett had drugs in his hand. During Horsley’s deposition he explained, “I’m giving him commands, and I’m like, well, maybe he’s got dope in his hand, maybe he’s going to the bathroom to flush them.” Later on in his deposition, Horsley stated that “milliseconds before [he] fired” he saw “a shiny black object” in Hammett’s hand. Horsley stated that he believed the “shiny black object” was a can of pepper spray, which the officers were trained to recognize.[7] Both Officer Whitener and Officer Horsley acknowledged their awareness of and training on the Paulding County Sheriff Office’s “Use of Force” policy,[8] and their understanding that the use of pepper spray does not constitute deadly force under that policy. A reasonable jury could therefore find on this record that Officers Whitener and Horsley shot at Hammett when they believed that he had either drugs or a canister of pepper spray, despite the fact that the presence of drugs or pepper spray is insufficient under department policy to warrant the use of deadly force. C. The Order of the Shots Fired at Hammett Third, a reasonable jury could find that Whitener fired the first shot, which grazed Hammett’s index finger, and that Horsley fired the second shot into Hammett’s back after Hammett had turned away from the officers. This finding is supported by both the autopsy report and by Officer Rutherford’s testimony. The district court found that Officer Rutherford’s testimony did not conflict with the testimony of Officers Horsley and Whitener because “Officer Rutherford testified that Defendant Hors-ley fell after the second shot that Officer Rutherford heard” and since “Officer Rutherford did not even know three shots were fired ... it is unknown which two of the three shots he heard.” Regardless of which two shots Officer Rutherford heard, however, his testimony necessarily precludes a reading wherein Horsley shot first and had fallen before any shots were fired by Whitener. While the majority accepts that Rutherford’s testimony could support Plaintiffs contention that Whitener shot first and Horsley second, they maintain that this does not vitiate Whitener’s claim that her actions were reasonable because—although Whitener initially said that she fired her gun at Hammett when she saw Horsley fall and thought he had been shot—she later said that it was because she saw Hammett move toward Horsley. A reasonable jury could find, however, that shooting a civilian merely because an officer sees him “move toward” a fellow officer, is not objectively reasonable. There is ample caselaw in our circuit to support that proposition. See, e.g., Felio v. Hyatt, 639 Fed.Appx. 604, 608-09 (11th Cir. 2016) (reversal of a grant of summary judgment on the use of excessive force when a suspected perpetrator on a report of domestic violence—who was engaged in a physical struggle with an officer and was reaching for his gun—was fatally shot in the abdomen, even though “the officers testified that it was a ‘dynamic’ scene and only a couple seconds passed between [the decedent] reaching for [the officer’s] gun and [the officer’s] firing”); Salvato v. Miley, 790 F.3d 1286, 1290 (11th Cir. 2015) (affirming a denial of summary judgment on the use of excessive force when the police shot a man who resisted arrest, exchanging blows with the officers, then broke free and “rush[ed] towards” the officers and began hitting them again, hitting one officer in the head and knocking her to the ground). As for Horsley, a reasonable jury could find that the location of the entry wound on Hammett’s lower back supports a finding that any perceived threat had abated by the time the second shot was fired, making the use of deadly force unreasonable. Hammett—who, by all accounts, had been facing Horsley head-on when the first shot was fired—somehow had his back to the officers seconds later when the second shot entered his body.[9] The short temporal window in which the shots were fired therefore does not militate against the conclusion that the use of deadly force was unjustified.[10] Conclusion Taken together, these factual findings could support a legal conclusion that the Defendant Officers acted unreasonably in employing deadly force. The majority concedes this point, acknowledging that “[i]f the evidence could legitimately be interpreted as Plaintiff insists it can, the officers’ use of force might have been excessive.” They maintain, however, that no such interpretation or reasonable inference can be made. This is not the case. To the contrary, the factual findings outlined here, and by the Plaintiff below, are supported by the forensic and testimonial evidence in the record, by far more than a “scintilla” as the majority dismissively suggests. Because that is the case, the district court erred in granting summary judg-ftient'to Defendants Whitener and Hors-ley. ' • I concede that the majority presents a feasible explanation of the events of October 17, 2012, but that recitation is neither the only reasonable interpretation of the evidence nor- the interpretation most favorable to the Plaintiff.[11] In holding otherwise, the majority has followed the same path as the district court below:- they have weighed the evidence and made credibility determinations that fall squarely within the purview of a jury. It may well be that a jury finds that the subsequent statements of the officers are more persuasive than the initial statements, or that they credit the police officers’ account and find it consistent with the forensic evidence... That does not change the fact, however, that, at the summary judgment stage,.the evidence must be construed in the light most favorable to the nonmovant, regardless of whether the court feels that one party’s version of events is more credible than the other’s. Lee, 284 F.3d at 1190 (citing Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir.2000) (“[T]his Court has repeatedly stressed [that] the ‘facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.’ ”); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir.2002)) (“Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff.”). Finally, I feel compelled to make an additional observation regarding the majority’s decision today. I am concerned by the implications of the majority’s view that Plaintiffs claim is undermined by the absence of opposing eyewitness testimony. By characterizing Plaintiffs legitimate interpretation of the physical and forensic evidence as “pure speculation” and “disputed by affirmative evidence, most obviously, the officers’ testimony,” the majority concludes that Plaintiffs interpretation of the physical evidence amounts to conjecture. Granting summary judgment on -qualified immunity under thesé facts therefore sets up a paradigm where, no matter how many inconsistent accounts of an incident an officer gives and no matter what viable theory is supported by forensic evidence, a fourth-amendment claim arising out of á deadly shooting will never survive summary judgment, unless a third-party eye-witness can support Plaintiffs narrative or the plaintiff survives the shooting. This cannot be the evidentiary standard in qualified immunity cases. In circumstances; where, as .here, the evidence creates a genuine issue of material fact regarding the conduct of police officers during a deadly shooting, the case should go to trial, where both sides will have a full and fair opportunity to present their best evidence to a jury. That jury— and not this Court or the district court below—should then weigh , the evidence, make factual findings, and determine the outcome of this case. For that reason, I respectfully dissent. Appendix [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] [[Image here]] . Although the majority includes a. 16-page summary of some of the testimony given in this case, the section entitled "Certain material facts on which the Parties agree” is a mere four sentences long, and relates only to the number of shots fired and the trajectory of the bullets from those shots. . Though I dissent with regard to the grant of. summary judgment on Hammett's fourth-amendment claims against officers Whitener and Horsley, I agree with the majority that the district court should be affirmed as to Hammett’s claims against Officer Mayfield. The facts regarding Mayfield’s conduct are troubling—particularly his own testimony that he heard gunshots and then blindjy discharged his weapon in a dark house where methamphetamine was being sold and the fact that, by all indications; his bullet struck Officer Whitener—but there is no evidence that the- bullet he fired struck Hammett, or that his actions otherwise contributed to Hammett’s death. Therefore Hammett’s claims against Mayfield fail as a matter of law. . The order entered by--the district court below acknowledges in multiple footnotes that there may be material issues of fact remaining about the events in question and that resolving those issues of fact would require the court to make credibility determinations that are not permitted on summary judgment. Nonetheless, the district court went on to conclude that summary judgment was appropriate. . The officers involved in the shooting of Hammett described the hallway as narrow, and a diagram included in the GBI file from this incident indicated that the hallways was only 15 feet long, and 3 feet wide. The photographs of the crime scene similarly indicate that the hallway in which Hammett was shot was short and narrow. . Horsley and Whitener testified that Hammett’s hands were brought up to the level of Horsley’s face. The record demonstrates that Officer Horsley is six feet two inches (74 inches) tall, twelve inches taller than Hammett and twenty-two inches taller than the height at which the bullet entered the wall. .Horsley’s opinion that Hammett was “absolutely not” attempting to comply with his commands in raising his hands because “if [Hammett] was going to comply he would comply” immediately and “every time [Hors-ley has] ever dealt with somebody that was compliant, that’s the way it happened” does not rebut Plaintiff's position or eliminate this • factual dispute. It creates, at best, an issue of fact for the jury regarding the credibility and weight that should be afforded to such opinion and conjecture. . Compounding the myriad inconsistencies in the record are the following non-testimonial accounts of what took place immediately before Hammett was shot. In an affidavit filed in support of a search warrant on October 17, 2012, Sergeant Mike Hill stated that Hammett "removed an item that was later determined to be pepper spray without delay and sprayed Agent Horsley in the face,” which led Horsley to shoot him. The CAD police call log relating to the search warrant’s execution also notes that an officer was sprayed in the face with pepper spray. On the other hand, Horsley stated that he was not pepper sprayed by Hammett, and a press release issued by the Paulding County Sheriff's Office on October 18, 2012 identified the "shiny black object” in Hammett’s hand as a canister of pepper spray, but made no mention of any offensive use of the pepper spray against the officers. . The policy states that "officers shall not use deadly force to seize an unarmed, non-dangerous subject” and that "they may use deadly force ... only when the officer reasonably believes that the suspect possesses a deadly weapon or any object which, when used offensively against a person, is likely to or actually does result in serious bodily injury.” The policy classifies the use of pepper spray as "Non-Deadly Force” and a "soft physical technique.” . I do not understand the basis for the majority's statement that “if Hammett were retreating back down the hallway when he was shot, the bullet would have traveled straight through him, not diagonally from left to right, which would have been impossible.” The record does not contain any support for this statement. In fact, given that Officer Horsley was positioned "facing [Hammett] slightly to the left” and Officer Whitener was positioned “on the right side of the hall” it seems highly unlikely that a shot from either would pass straight through him. This interpretation of course—like the majority’s statement—is pure speculation. . Moreover, the majority’s assertion that "Plaintiff has not pointed to any affirmative evidence that Hammett surrendered and retreated” is irrelevant to a determination of whether summary judgment is warranted if there was no threat to the officers that would warrant the use of deadly force. Reducing the question before the Court to one of whether Plaintiff has proven that Hammett surrendered and retreated unduly broadens the protections of the qualified immunity doctrine and turns the summary judgment standard on its head. . .The majority’s summary of the testimony in this case fails to acknowledge the highly material inconsistencies between the statements given by the officers in their initial GBI interviews, their depositions, and their declarations submitted in support of summary judgment. The case cited for the proposition . that those statements cannot form genuine issues of material fact is inapposite because this case—unlike Anderson, which involved libel charges and "discredited” statements— involves multiple statements by the Defendants that have materially changed in the nearly four years between the-incident and the most recent declarations given in support of their motions for summary judgment. Each statement is "affirmative evidence.” The Court should not credit one and discredit another, but it should allow Plaintiff to rely on the earlier statements just as it allows Defendants to rely ‘on the later ones. Any comparative credibility determinations should be made by a jury at trial, in conjunction with forensic and other testimonial evidence.