[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13190

_____

D.C. Docket No. 5:10-cv-00047-LGW

JOSEPH HARPER,

Plaintiff-Appellee,

versus

JEREMIAH DAVIS, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(July 11, 2014)

Before MARCUS and ANDERSON, Circuit Judges, and GOLDBERG,* Judge.

_____

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by
   designation.

GOLDBERG, Judge:

On a late spring night in 2008, officers Jeremiah Davis and Matthew Gourley tasered an inebriated suspect out of a tree.  The suspect, Joseph Harper, careened to the ground headfirst, injured his back, and was rendered paraplegic.  This case considers whether Davis and Gourley are liable for using excessive force to arrest Harper in violation of the Fourth Amendment of the U.S. Constitution.

Harper brought suit against four officers, including Davis, Gourley, Christopher Perkins, and Rodney Courson, on May 19, 2010.  Harper styled his federal constitutional claims under 42 U.S.C. § 1983 (2006) and also lodged state claims under Georgia's constitution and statutes.  Shortly thereafter, the defendants moved to dismiss.  The district court granted the motion to dismiss state claims against Gourley but denied the motion as to all other claims.  We affirmed in an unpublished opinion on February 29, 2012.  *Harper v. Perkins*, 459 F. App'x 822 (11th Cir. 2012).

After discovery, the defendants moved for summary judgment.  The district court granted the motion respecting federal claims against Courson and Perkins and all of Harper's state claims.  The court denied summary judgment, however, on Harper's excessive force claim against Davis and Gourley.  *Harper v. Perkins*, No. CV 510-047, 2013 WL 3048322, at *4−7 (S.D. Ga. June 17, 2013).  These two defendants now appeal the district court's decision and argue that they enjoy

2

qualified immunity from suit.  We agree, reverse, and remand to the district court

to enter judgment in Davis and Gourley's favor.

## I. BACKGROUND[1]

### A. Harper Fights with His Fiancée

It was May 26th, 2008—Memorial Day Monday—and plaintiff Joseph

Harper was grilling ribs.  Mr. Harper, along with his fiancée Mary Crimmins, and

their two sons, "Little" Joey and Johnny Ray, had gathered at the home of Harper's

sister Laverne in Douglas, Georgia for a late-afternoon barbeque.  As he fussed

with the meat, Harper drank about six bottles of Budweiser beer in a two- to three-

hour stretch.

Meanwhile, Crimmins wanted nothing more than to abandon the party,

return home, and go to bed.  She approached Harper to voice her complaint as he

grilled.  "I'm cooking; we can't [go]," Harper replied, but Crimmins stood firm.

She threatened that if Harper did not leave the barbeque now, Harper "could find

[his] own way home."  At last the "angry and embarrassed" Harper caved to

Crimmins' demands and left Laverne's house.  He managed to extract one parting

concession, however.  Instead of going home immediately, the family would visit

---

[1] "The court [must] grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We view the evidence and resolve all reasonable doubts in favor of the nonmoving party.  *See Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).

3

Eric Dibble—the cousin of Harper's ex-wife Tracy Lynn—for a few more moments of holiday revelry.

At Dibble's, Harper and his cousin amused themselves with a game of pool and "a few shots of some kind of liquor." Crimmins remained outside and smoldered on the doorstep. Eventually the family left for home, but right after arriving they departed again, this time for their neighbor Danny Chaney's house. At Chaney's, Harper helped himself to "maybe one or two more beer[s]" from the cooler. By this time Harper was, of his own admission, an intoxicated man.

Then the quarrel started. At Chaney's house, Harper asked Crimmins whether he could borrow her van to go get more alcohol. Crimmins refused, flustering Harper in front of his friend. Later on at home, the pair continued their argument, which soon blew "out of control." While two year-old Johnny Ray slept on the couch and four-year old Joey played video games in the living room, Harper and Crimmins tussled in the bedroom. Crimmins tried to call the police, but before she could connect, Harper seized the phone and threw it against the wall. The fight then migrated to the dimly lit living room, where Crimmins came on Harper "like a bulldog and attacked." After tripping over their son Joey, the couple wrangled on the floor, and Harper endeavored to pin down Crimmins' churning arms.

Around that time, Harper's nephew Brandon Singleton entered to calm the conflict. His efforts, however, proved fruitless. As Singleton intervened, Harper

4

exclaimed, "Why don't y'all just leave me alone[?]" and marched to the bedroom to grab his .22 rifle.  When Harper returned, Crimmins was heading out the door with one of the children.  Harper then loosed a volley of bullets into the ceiling as Crimmins loaded her sons into the van, hoping Crimmins would return "if she thought [Harper] was serious about killing [himself]."  But the plan did not work—Crimmins sped with the children into the night.

After Crimmins left, Harper spirited away to the woods behind his house.  He ran—high stepping around the prickly pads in his path—until he paused to deposit his rifle in the fork of a tree.  Harper squatted next to the tree and cried.  "I knew . . . right then that Mary was leaving and it—and I knew that things had gone too—way too far and I just—I broke down."

## B. The Police Arrive

Earlier that evening, as Crimmins and Harper's altercation broiled, Brandon Singleton called the cops.  The emergency dispatcher asked Singleton what was the matter.  "Yea, I'm at 358 Loblolly Lane in Hickory Hills," Singleton said.  "I got fuckin' a man pointin' guns at everybody, beatin' on his wife, I need the fuckin' police out here now."  Then the call dropped.  When they reconnected, the dispatcher asked Singleton to describe the house so police would recognize it as they approached.  "It's a trailer.  It's a big ass blue Dodge in front of my trailer,"

5

Singleton explained. "The woman is leaving now with the kids and he is chasing them with a fuckin', a fuckin' [knife??]."

Coffee County police officer Christopher Perkins responded to the call at 10:25 PM. While heading to Loblolly Lane, Perkins spotted Crimmins flagging him down at an intersection. Perkins stopped and spoke to Crimmins, who reported that Harper had been drinking all day and taken methadone. Perkins also noticed that Crimmins was injured. After urging Crimmins to stay put, Perkins drove on to meet Singleton and Sergeant Rodney Courson, who had arrived first, in front of Harper's house. Singleton told the officers that he had heard screams and seen Harper atop Crimmins, holding her arms down. Singleton also relayed that Harper pointed a gun at him, fired into the ceiling, and threatened suicide before dashing into the forest.

When they heard Singleton's story, the officers elected to search for Harper in the woods. They called for canine backup, and defendants Jeremiah Davis—a Coffee County deputy—and Matthew Gourley—a canine officer from the Georgia Department of Corrections—arrived on the scene.[2] Courson and Perkins briefed the new arrivals on events to that point, and the foursome donned bulletproof vests, a procedure reserved for exceptional situations. Then the officers walked to the

---

[2] Gourley also spoke with Crimmins on his drive to Loblolly Lane. Crimmins told him "she was afraid to go back to her house because of what had happened."

6

back of the house with Gourley's bloodhound.  The dog picked up a scent, and the chase was on.

## C. Harper Falls from the Tree

Harper peered through the woods to see police flashlights sparkling in his backyard.  At that moment Harper scaled the tree where he had stashed his rifle.  "I was hoping if they shined the light out there [in the woods] and didn't see me, that they would just take a statement and leave," Harper explained at his deposition.  But onward the officers marched.  When Harper saw a dog leading the search party, he "eased up on some little bitty limbs that was on there and I kind of—I kind of just squeezed myself to that tree."

Meanwhile Gourley and Davis tailed the bloodhound, moving ahead of Courson and Perkins as they went.  They passed some trash and an old shed, then the dog lifted its head and "winded."  That meant the target was nearby.  Harper, seeing the bloodhound sniffing near the base of his tree, "knew [that he] was caught."  "Hey, I'm up here," he called to the officers, and Perkins, who was standing just below Harper's perch, said "He's up in the tree."  Gourley and Davis doubled back and trained their flashlights on the suspect.  They had unwittingly passed by Harper as they tracked.

"Let me see your hands.  Let me see your hands.  Come down out the tree," the officers hollered.  Harper looked at the officers and said, "My hands is out,"

but they kept yelling for Harper to show his hands and descend. Then Harper pushed himself back off the branch and cussed, "What the fuck you want me to do? I can't do both. My hands is out." At that moment, Harper remembered the rifle lodged upright in the tree fork near his feet. Fearing the police would kill him when they saw his gun, Harper alerted Perkins—who was still directly below him—"There's a gun down there at the tree." Perkins shined his flashlight on the rifle and back on Harper, then shouted, "He's got the fucking gun up in the tree with him."[3]

That instant, Gourley shot his electronic control device—or Taser—at Harper's bare abdomen. The Taser probes struck just below Harper's bottom left rib but failed to transmit a clean electric shock. As Harper fell back against the tree and slapped the malfunctioning wires from Gourley's Taser, Davis reholstered his handgun and drew his own Taser. Davis fired his device at Harper, and this time the probes made a sound connection. Harper's body, seized with electricity, fell from the eight foot-high branch and torpedoed headlong to the earth. The fall left Harper a paraplegic.

---

[3] The location of Harper's rifle is hotly disputed. In his deposition, Harper indicated that the gun remained stashed in the fork below him, somewhere near his feet, when he was tasered. This account seems to jibe with a statement Davis made for an internal investigation completed a day after Harper's fall. Officer Courson, on the other hand, said Davis reported after the incident that Gourley saw Harper reaching for the rifle. Finally, both Davis and Gourley testified in their depositions that they saw Harper holding the rifle just before he was tasered. Clearly not all of these accounts are true. For the purposes of summary judgment, however, we credit Harper's version of the facts, *i.e.*, that the rifle remained below him before the fall. *See Morton*, 707 F.3d at 1280.

8

The entire exchange—from when Harper saw the officers tromping through the woods to the moment Harper hit the ground—lasted little more than a minute.

## II. DISCUSSION

This appeal presents one issue for decision:  Are officers Jeremiah Davis and Matthew Gourley liable under the Fourth Amendment of the U.S. Constitution for the injuries Harper sustained on the night of May 27, 2008?[4]  After a careful review of the record, the law, and the briefs, we answer this question in the negative.  *See Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) ("We review a district court's denial of summary judgment on qualified immunity grounds de novo.").

## A. Fourth Amendment Excessive Force Law

The Fourth Amendment guarantees "the right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  This provision requires, as a corollary, that officers of the state refrain from using unreasonable force to make arrests and investigatory stops.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Unfortunately there is no clear signpost demarcating "the hazy border between excessive and acceptable force."  *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).  Instead, courts analyze excessive force claims in a deeply factual way, considering "the severity of the crime at

---

[4] Defendants tasered Harper after midnight.  Thus it was May 27, not May 26, when Harper fell from the tree.

issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts appraise these factors from the perspective of "a reasonable officer on the scene," and not through "the 20/20 vision of hindsight." *Id.*

Yet even if an officer violates the Fourth Amendment as explained above, that does not mean he falls subject ineluctably to suit. The doctrine of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Wood v. Moss*, 134 S. Ct. 2056, 2066−67 (2014); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008). This formula metes liability to police who act irresponsibly while shielding those who make reasonable mistakes in the line of duty. *See* 555 U.S. at 231.

To claim qualified immunity, defendants must show they were performing discretionary duties when the alleged abuse occurred. *Bates*, 518 F.3d at 1242. Then, if defendants carry their burden, plaintiff must prove both that the officers breached a constitutional right and that the right was clearly established when the

10

misconduct occurred. *Pearson*, 555 U.S. at 232. The trial court may choose which element of plaintiff's burden to analyze first. *Id.* at 236. And, should plaintiff fail to show that the law clearly proscribed defendants' conduct, the court may dismiss the claim without deciding the constitutionality of the disputed deeds. *See id.* at 243−45; *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ("[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all."); *Camreta v. Greene*, 131 S. Ct. 2020, 2030−31 (2011) ("If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.").

## B. Gourley and Davis Merit Qualified Immunity

With these principles in mind, we dismiss Harper's Fourth Amendment claim against Davis and Gourley. The defendants briefed qualified immunity at summary judgment, and nobody disputes that defendants were discharging discretionary duties when they arrested Harper. *See Harper*, 2013 WL 3048322, at *7 (implicitly assuming that defendants met burden). Consequently, Harper had to show that the law in force on May 27, 2008 clearly proscribed defendants' conduct. Neither he nor the district court did so.

11

To prove that the law clearly barred a defendant's behavior, plaintiffs have two paths they can follow.  First, they may cite case law that would have given defendant "fair warning" that his conduct was unlawful.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  The facts of these cases need not be "materially similar" to the facts at hand, but they must be similar enough so "a reasonable official would understand that what he is doing violates [a constitutional] right."  *Id.* at 739; *see also Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011).  This Court considers only "cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose" in this analysis.  *Coffin*, 642 F.3d at 1013.

Alternatively, plaintiffs may argue that a general constitutional rule applied with "obvious clarity" to ban defendant's conduct.  *Hope*, 536 U.S. at 741.  This approach recognizes that, at times, no binding precedent exists to prohibit a defendant's specific acts.  In such situations, officers have fair warning if their conduct "lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of caselaw."  *Smith*, 127 F.3d at 1419.

    **i.**       **The Alleged Violation Was Not Clearly Established in Case Law**

Harper took neither avenue to show that Davis and Gourley's conduct was clearly unlawful.  Harper, for one, cites no cases published before May 2008 that

12

plainly barred defendants from using significant force to arrest Harper and ensure he was not armed.  And although the district court supplied cases of its own to fill the gap, none of these precedents measure up.  *Harper*, 2013 WL 3048322, at *7. *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), for example, considered a plaintiff who did no wrong but to honk her horn in a traffic jam.  The defendant officer pulled plaintiff over and requested her driver's license, but before plaintiff could retrieve her license, the officer yanked her from the car by the wrist.  *Id.* at 1191. Then, after the officer cuffed plaintiff, he "led [her] to the trunk of [her] car and slammed [her] head down onto the trunk."  *Id.*  We denied the defendant qualified immunity because "a reasonable officer could not possibly have believed" he had cause to slam the suspect's head "*after* she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer . . . had passed." *Id.* at 1199.

Here, by contrast, a reasonable officer might question whether "any danger had passed" when defendants tasered Harper.  Unlike the *Lee* plaintiff—who did nothing wrong but to tap her horn—Harper had reportedly beaten his wife, pointed a gun at his nephew, fired rounds into the ceiling, threatened suicide, and fled armed into the woods before the police arrived.  *See id.* at 1190−91.  Furthermore, Harper stood in a tree just above Perkins (a position of tactical advantage) when defendants spotted him.  Finally, as defendants hollered at Harper to show his

13

hands and descend, Perkins shouted, "He's got the fuckin' gun in the tree with him." In this chaotic moment—with the suspect cornered but loose and an unsecured rifle somewhere nearby—a reasonable officer might use a "degree of physical coercion" bordering on deadly force to make an arrest and ensure the safety of his fellows. *See Graham*, 490 U.S. at 396. At least Harper was not "fully secured" such that force was "unnecessary to any legitimate law enforcement purpose." *See Lee*, 284 F.3d at 1199.

The trial court's other cases, *Slicker v. Jackson*, 215 F.3d 1225 (11th Cir. 2000), and *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000), also failed to warn defendants that tasering Harper was unconstitutional. In *Slicker*, the plaintiff was arrested for disorderly conduct at a police station. 215 F.3d at 1227. After cuffing the plaintiff, defendants kicked the plaintiff and knocked his head into the pavement. *Id.* Unlike Harper, the *Slicker* plaintiff had not committed a violent crime, had no weapon, and was fully secured when the cops beat him. In a similar vein, the *Priester* plaintiff, suspected of stealing $20 of snacks and crackers, obeyed defendants' demands and prostrated himself on the ground before police loosed a German Shepherd on him. 208 F.3d at 923 n.1, 927. Again: no serious crime, no weapon, no apparent resistance to arrest. *Lee*, *Slicker*, and *Priester* do not clearly show that tasering Harper was unconstitutional.

### ii.    The Alleged Violation Was Not "Obviously Clear"

14

Harper also fails to show that the law barred defendants' conduct with "obvious clarity." *See Hope*, 536 U.S. at 741. On summary judgment, the trial court quoted our decision at the motion-to-dismiss stage to show that tasering Harper was unreasonable. 2013 WL 3048322, at *7. In that opinion we found—based on scarce evidence in the complaint—that Harper "(1) was at least four feet up in a tree with his hands raised, (2) posed no threat to [the officers'] safety or the safety of others, (3) had no chance, and did not attempt, to flee, and (4) merely put his hands in the air in compliance with the instructions of at least one officer." 459 F. App'x at 827. We concluded that tasering a suspect so situated obviously violated the Fourth Amendment. *Id.* (citing *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009)).

Harper would have us make the same finding now, but we refuse to do so. First, in our previous opinion, we had no occasion to consider the initial *Graham* factor, the crimes leading to Harper's arrest: "As for the first factor of the excessive force test—the severity of the plaintiff's crime—we have little basis to assess it, because he did not specify his crime in the complaint." *Id.* at 826; *Graham*, 490 U.S. at 396. After discovery we know, however, that defendants were told Harper overdrank, beat his wife, fired a rifle in his home, threatened suicide, then fled with his weapon into the woods. Harper's crimes were indeed so worrisome that Gourley, Davis, and the other officers donned bulletproof vests

15

before tracking.  We doubt a reasonable officer would find it "readily apparent" that defendants' force was excessive under the circumstances.  *Smith*, 127 F.3d at 1419.

Discovery evidence also leads us to reconsider another *Graham* factor: whether a reasonable officer would think Harper made no attempt to escape arrest. *See* 490 U.S. at 396.  On this score, the trial court highlighted that Harper tried to surrender but could not raise his hands and descend the tree at the same time.  2013 WL 3048322, at *6.  "[V]iewing the facts in the light most favorable to Plaintiff," the trial court reasoned, "Plaintiff was as compliant as possible."  *Id.*  Yet this analysis misses an important point.  In qualified immunity cases, we ask not whether the *suspect* intended to surrender, but rather whether a *reasonable officer on the scene* would think the suspect was surrendering.  *See Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1168 (11th Cir. 2005) ("Although the facts must be taken in the light most favorable to the plaintiffs [at summary judgment], the determination of reasonableness must be made from the perspective of the officer.").  One must remember that Gourley and Davis found Harper in a tree.  This initial position betokened flight, not gentle surrender.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1291−93 (11th Cir. 2009) (approving use of canine against suspect who tried to surrender but remained concealed in underbrush).  And while we concede that the officers' twofold commands made compliance difficult, we disagree that

16

defendants behaved unreasonably under the circumstances. To arrest their suspect, the officers had to coax Harper from the tree; to ensure the suspect did not shoot them, the officers needed Harper to show his hands. We cannot hold in hindsight that defendants' commands were improper or that it was readily apparent that tasering Harper was unwarranted. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) (refusing to evaluate what officers "could or should have done in hindsight" to deescalate suicide situation).

Finally, we disagree that a reasonable officer would think Harper posed no "immediate threat to the safety of the officers or others." *See Graham*, 490 U.S. at 396. In finding that Harper posed no danger to defendants, the trial court noted that Harper's "hands were raised and empty" when the officers deployed their Tasers, and Harper "had abandoned the gun far enough away that he would have had to move away from his current perch to access it." 2013 WL 3048322, at *6. But once again, this analysis views the evidence from Harper's perspective, not an officer's. Even if Harper were entirely unable to harm defendants—whether because his rifle was out of reach, because he was trying to show his hands, or because he planned to surrender—a reasonable officer in defendants' shoes would have thought Harper was dangerous. Before the search, Gourley and Davis learned that Harper was drunk and had a gun. Then, in the tense seconds after the officers found their suspect in the tree, and as Harper fumbled to show his hands and come

17

down, Perkins exclaimed, "He's got the fuckin' gun in the tree with him."  Gourley

tasered Harper immediately, and Davis followed suit just seconds after.  Even

drawing reasonable inferences in Harper's favor, we cannot say it was obviously

clear that defendants' acted excessively to neutralize the perceived threat.  To echo

our holding in *Carr v. Tatangelo*, a "reasonable but mistaken belief that probable

cause exists for using [significant] force is not actionable under § 1983."  338 F.3d

1259, 1269 (11th Cir. 2003); *see also Penley v. Eslinger*, 605 F.3d 843, 854 (11th

Cir. 2010) (finding reasonable the shooting of a teenager armed with a realistic-

looking plastic gun).[5]

### III. CONCLUSION

In sum, Harper failed to show that defendants infringed his clearly

established constitutional rights.  Thus we grant Gourley and Davis qualified

immunity without directly assessing the constitutionality of their conduct.  By so

holding, we do not wish to belittle the personal tragedy Harper suffered on that late

spring night.  No doubt losing one's mobility and one's family in a single stroke

inflicts wounds beyond repair.  Even so, we cannot hold defendants liable for

---

[5] We have considered all of Harper's other arguments and find they lack merit.  Harper claims, for example, that defendants could not have heard Perkins alert them to the gun in the tree because both defendants said they saw Harper holding the gun.  Yet Harper testified that Gourley tasered him immediately after Perkins shouted the gun's location.  From this testimony, which we must credit at summary judgment, we can only infer that defendants tasered Harper in response to Perkins's cry.  The evidence does not support alternative inferences, e.g., that defendants would have tasered Harper even if they knew plaintiff could not reach the gun.  *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (holding court need not withhold summary judgment if nonmovant's inferences "implausible").

18

conduct that the law did not clearly prohibit.  For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded with instructions that judgment be entered for Gourley and Davis.

**REVERSED** and **REMANDED**.